## Paschal N. Smith *against* Daniel Williams.

An owner of a ship bottomed for more than her value, has not an insurable interest in her. Judicial acts of foreign tribunals are *prima facie* to be deemed correct; therefore, no inference to be made against them.

IN error on a bill of exceptions tendered and sealed at the trial of a cause upon a policy of insurance, on the body of the ship *Prosper*, in which, *Williams*, the now defendant, was plaintiff below. The case, as stated in the 2 *New-York Term Reports*, from the first to the fourth page inclusive, is accurately detailed, in all respects but one. It is there mentioned, in page 4, that the vessel sold under the attachment for $8,400, instead of 38,500 reals of vellon. In the opinion, however, of *Thompson*, J. page 19, the sums are correctly specified.

The error now relied on was, that the judge at *nisi prius*, in conformity to the decision of the Supreme Court, ruled the now defendant to have an insurable interest in the vessel, to the extent of the sum he paid for her, though she was then bottomed for a larger amount, and that, unless he, at the time of effecting the policy, knew of the lien upon her, he had a right to a verdict for the value insured, after deducting the price at which the vessel sold.

THOMPSON, J. assigned the reasons of the determination, as they are given in 2 *New-York Term Reports*, 19, 20, 21.

*Harison*, for the plaintiff. The question now before the court is, whether a man buying a vessel, bottomed for more than her value, has an insurable

interest? Where a ship is hypothecated, an owner can insure only his surplus interest, beyond the amount of the lien. Here he had none. His being a *bona fide* purchaser, does not alter the question.— He takes the title of his vendor, and stands exactly in his situation. Therefore, as to the effect of the bottomry, *Delavigne* and *Williams* are to be considered as one person, and the property equally affected by the lien, whether in the hands of one or the other. It is like the common case of a purchase of a chattel from an apparent owner. The vendee, unless it be sold in a market overt, takes it subject to the rights of third persons. The defendant, therefore, could acquire no greater interest under the sale, than that which *Delavigne* could dispose of; that is, the surplus value beyond the hypothecation. To the extent of the bottomry bond, the holder of the bond is owner of the vessel; and herein it differs from a mortgage.— This will appear by adverting to a bottomry bond, which is, in effect, a species of insurance, nay, its twin-brother. In the former, the money is advanced before the loss; in the latter, after. In either case, the original owner is, in case of accident, equally secure, as the money is not, like a mortgage, to be returned. By payment of a loss, an insurer becomes a purchaser; so, on a bottomry, which is nothing more than an anticipated insurance, the lender, on making the advance, acquires the property to the amount of the money he pays. Consequently, the original owner cannot have any interest, excepting that which remains beyond the extent of what he borrows. It follows, therefore, that he should not be permitted to insure more than that excess. A

ALBANY,
February, 1805.

Smith
v.
Williams.

contrary doctrine would be to tolerate double insurances, and open a wide door to fraud.  A man may take up two-thirds of the worth of his ship on bottomry; if he may also cover, by an insurance, her full value, he would, in case of a loss, put into his pocket, the two-thirds he had borrowed.  This would be a temptation to dishonesty.  Reason and policy, therefore, require, that only the excess of value beyond the sum for which a vessel is bottomed, should, in the original owner, be deemed an insurable interest.  For the lender of the money advanced, is, to the extent of the loan, the actual owner.  In cases of jettison, he is bound to contribute. 2 *Val.* 19. 2 *Emer.* 504, citing *Le Guidon, ch.* 19, *art.* 5.  This, it may be said, is the law of *France*, but that the rule in *England* is different.  It is not, however, on that account to be preferred by us. . The doctrine, from the authorities cited, is that of the general commercial code, drawn from the oldest books in the world, and resting upon the sanction of various nations in all ages, not upon the maritime ordinances of any particular country.  For, if the vessel perishes, the lender on bottomry must be the sufferer; if she be saved, he will be the gainer, and he ought, then, to contribute, which can be only as owner.  As a species of double insurance, the policy now before the court is necessarily void. 2 *Val.* 61. 1 *Emer.* 236, 7.  For, on a contract which is purely one of indemnity, a clear and certain gain of the sum insured, can never be allowed to take place.  It is not correct to argue, that the insurance will be void or not, according as the fact of the bottomry was, or was not known to the insured.  Ignorance, in many instances, furnishes no pretext for

upholding the policy. If a vessel be not seaworthy, the insurance will be void, though it was not known that she was so. Because, the concealment of a material fact, though innocently done, vacates the agreement, it being the duty of the insured " from motives " of common prudence, to inform himself of every " fact and circumstance, which may throw the small- " est light on the nature and perils of the proposed " adventure." *Marsh.* 347. *Millar,* 40, 41, 46, 47, 97, to the same point. It is necessary, now, to proceed to another foundation of the law of insurance, which presents to the recovery an obstacle, which, it is conceived, is insurmountable. Every policy *bona fide* effected, containe an implied engagement, that, in case of abandonment, the underwriter shall be entitled to receive the subject matter. It is an essential part of the contract, that the benefit of abandonment shall be saved to the insurer. Otherwise, a loss not absolute in itself, but a mere technical total, on which two-thirds may be recovered, would be totally lost to the underwriter. Tested by this rule, the policy, now litigated, fails in an essential ingredient. The bottomry, though latent and unknown, destroyed that right to the property on abandonment, which was the basis of the insurer's undertaking, and therefore avoided the policy. Any thing which takes away from the underwriter those rights, on having of which he is supposed to have entered into the contract, vacates the agreement. A previous direction not to pursue one of three routes, on a voyage, where it was usual to leave the whole three to the discretion of the captain, was held to prevent a recovery, because the underwriter made his calculation, on

P

the advantage of the captain's judgment as to all.—— *Middlewood* v. *Blakes*, 7 *D. & E.* 162. The same principle ought to govern on the present occasion.

*Riggs* and *Benson*, contra. Though the position, that a purchaser of a chattel takes it liable to all the incumbrances which affect it in the hands of the seller, were correct, still it may have further exceptions, than the one arising from a sale in market overt. Liens may become invalid from the *laches* of the persons who hold them. As to markets overt, what are they in this country? Streets, for wood and hay, and other articles. Shops and warehouses, for goods. Wharves, for ships. If property is entrusted to another in such a manner that he *may* dispose of it, a *bona fide* sale is good. It is incumbent on the holder of a bottomry bond to take possession of the vessel on her arrival at her first port. If he do not, it is a waiver of his lien, and the vessel, in the present instance, being *bona fide* sold in a market overt, for such a wharf must be considered, the title of the purchaser is good against all the world. It is contended, however, that he who borrows on bottomry, has not in his vessel, any insurable interest, except for her surplus value beyond the sum taken up. There is no such rule in our law, nor in that of *England*, for none such can subsist. Suppose an owner of a ship in a foreign port, bottoms her for a sum, which he lays out in masts, yards, and repairs, to enable her to prosecute the voyage; is not the vessel enhanced in value by so much as is thus actually converted into ship? and cannot the owner insure that, into which the money is thus changed? It is true, the lender on hypothecation,

ALBANY,
February,1805.

Smith
v.
Williams.

has but a special insurable interest, which he is bound to particularize. Therefore, that of the owner remains as before. The doctrine of double insurances does not apply to this case. It supposes the insured to have been the borrower of the money. That is not so here ; for the defendant, *Williams*, knew not it was taken up. That the security was not by way of mortgage, if it makes any difference in the question, operates in our favour. For a mortgage passes a legal interest in the subject. Bottomry does not ; it only gives a right, if exercised in due time, of going into court and obtaining process against the vessel. The difference is the same as between judgments and mortgages. The first give a lien, but no interest, which is to be acquired only by legal proceedings, instituted upon them. But even in the case of an absolute assignment of a ship, if in the nature of a mortgage, the mortgagor is deemed the legal owner ; liable for the necessaries and repairs of the vessel, and, until possession taken by the mortgagee, he alone is entitled to sue for the freight earned. 1 *H. Black.* 117 (*n.*)* Can it, then, be said, that the mortgagor has not an insurable interest ? If so, why has not the contract been disaffirmed, and the premium returned ? It has been urged, however, that the right to have the benefit of the property abandoned, has been lost to the insurer, and therefore the policy is void. Taking it for granted, as has been insisted, that the now defendant, acquired by his purchase no title, but what was subject to the lien on the vessel, as he was a *bona fide* purchaser, he had a recourse against the vendor, and on abandonment, that recourse passed with the vessel to the insurer. Besides, the idea of this loss of

* *Chinnery v. Blackburne.*

the property insured, proceeds on the supposition that the *Consulado* in *Spain* rendered a proper judgment. This we deny, for we contend that the lien by the bottomry was gone, upon the vessel's sailing from the port of her first arrival. The lender should have followed the ship, demanded his money, and on refusal, have applied to the admiralty for process against the vessel. It is not, however, true, that the property has been lost to the underwriter. He gets the amount, of what it sold for, deducted; and, therefore, obtains the full benefit of the abandonment.

*Harison*, in reply. To make our streets and wharves, markets overt, they should have clerks, and records of the sales made in them. Those are the ingredients required by law. There is nothing, therefore, shown to do away the position, that the defendant's title could be no better than his vendor's. If so, he had no interest, but in the surplus, beyond the amount of the bond. Laying out on the vessel, whatever is raised on bottomry, does not increase the interest of the borrower. For it is at the expense of the lender. His money, not that of the insured, has, in case of loss, been expended. To sanction, therefore, the present policy, would be in fact to authorise double insurances. It is a mistake to imagine there ought to have been a return of premium to justify a resistance to the suit, or rescind the contract, as it is called. In cases of non compliance with warranties, the premium is not always returned, though it may be recovered in the very action, where the policy is declared to be void. We trust, therefore, a *venire de novo* will be directed.

*Per curiam*, delivered by *Lansing*, chancellor. It has been admitted by the parties, and it is so stated in the bill of exceptions in this cause, that the defendant was entitled to have recovered in the court below, if the interest intended to be covered by the policy was insurable.

It has also been admitted in argument, that the intent of the parties, *deducible from the policy*, was to constitute it an interest, and not a wager policy, and the only questions on which the opinion of the court is required ; are, 1st. Whether the interest of the obligee, of the bottomry bond was a valid lien, and such a one as would be enforced by the maritime law ? 2d. Whether the vessel in question, being subject to a bottomry bond, greater in amount than its value, was insurable by the defendant, *Williams ?*

The only objections which have been urged to the validity of the bottomry bond, as affecting the interests in controversy between the parties, are, 1st.— That it was not enforced in due time. 2d. That as the defendant, *Williams*, was ignorant of its existence, at the time the policy was underwritten, it ought not to vitiate it, as having been made under the impression of mutual error.

As to the objection that the bottomry bond has not been enforced in due time.

The policy appears to have been made on the 13th day of *May*, 1800, on a voyage from *New-York* to *Algiers*, with liberty to touch at *Cadiz*. The ship was purchased in the *November* preceding, by the defendant, *Williams*, of *Casimir Delavigne*, for whom a bottomry bond had been executed on it, *by procuration*, at *Amsterdam*, previous to such sale ;

but no other circumstance respecting the time when such bond was executed, the voyage described in it, or the port considered as the home port of the ship, as to the bottomry, were offered in evidence.

It, however, appears, that the bottomry bond was given for 6,500 dollars, which is 1,500 more than the valuation of the ship in the policy, and that she was sold at *Cadiz*, by order of the royal *Consulado*, who, it is not contended, had not a competent jurisdiction, and who acted judicially on the occasion.

The judgments of foreign courts, having competent jurisdiction, have always been considered *prima facie*, as binding in the points on which they have expressly adjudged. The period of the inception of the contract, on the voyage which was the object of it, not having been disclosed, for aught that appears, it may, though made at *Amsterdam*, as it was done by *procuration*, have been executed the day before the sale to the defendant, and may have attached to the voyage insured, terminating it at *Cadiz*. The ship was at *New-York*, at the time of the sale, and there is no proof that she left that port, till she sailed on the voyage insured. Hence there is no ground legally to infer a *laches* in enforcing the lien created by the bottomry bond.

If the voyage to *Cadiz*, was the voyage insured, the intermediate transfer to the defendant, *Williams*, certainly could not avoid the bond, or impair the rights of the obligor. For if a transfer, pending the voyage, constituted an avoidance, the lien supposed to be created by the bottomry bond, must be completely in the power of the obligor to defeat, when-

ever it comported with his views.    This would lead
to consequences too clear to require elucidation.

As to the 2d objection.    The insurer is a perfect
stranger to the subject insured ; whatever relates to
it, must be considered as peculiarly resting in the
knowledge of the insured, and the law imposes it on
him to acquire a competent information respecting it.
This is a salutary and well established rule.    For
how is it possible to determine with unerring certain-
ty, the exact state of intelligence he possessed ? Or
what portion of the ignorance he possesses, is to be
attributed to his want of exertion, or to his wish of
concealment of the latent defects, which may affect
his interest ? If he does not possess the full know-
ledge of every circumstance respecting it, involving
the interests of others, it may be his misfortune, but
it must legally be imputed to him as a fault.

Every reasonable intendment is to be admitted in
support of the judgment of the *Royal Consulado*. The
defendant, *Williams*, was on the spot, clothed with
the powers of owner and master.    He was interested,
in the one capacity, to vindicate his right of property ;
in the other, as agent for the concerned, to repel any
illegal claims :  He had an opportunity to make a de-
fence.    In all events, if the judgment was examina-
ble, he might have furnished the reasons and proofs
to warrant it ; that this has not been done, affords a
strong inference that it was not in his power.

The second question is important as it respects the
general interests of commerce, and it is peculiarly
desirable, that a decision of the court should satisfac-
torily put it at rest.

Whenever the bottomry and the policy are coextensive, as to voyage and time, no collision can arise. If the ship arrives at its port of destination in safety, the policy is satisfied ; but the lien created by the bottomry, still exists.   If the ship had been injured by any of the perils insured against, so as to entitle the insured to an average loss, it could not affect the interests of either of the parties to the bottomry bond.   But if the ship perishes totally ; or if a technical total loss is sustained before she arrives at her port, the insured would recover, if the policy is valid, without interest.   For the value of the ship being covered by the bottomry, the obligee cannot recover the money advanced on it; his right to it ceasing with the destruction of the ship, or the necessary dereliction of the voyage.   To this intent, the obligee in the bottomry bond must, therefore, be considered as owner, for he is to receive nothing, unless the voyage is made.

If the bottomry interest existed before the policy was underwritten, and instead of being limited to the ulterior port of destination, described in the policy, was to be enforced at any intermediate port at which the ship might touch ; or, if the ship was so much deteriorated as to constitute it a technical total loss, at the port of her destination, no abandonment could be made with effect, and the insurers would be entangled in difficulties, which they had no reason to calculate upon, at the time of making the policy.

The policy of insurance, is always considered as a mere contract of indemnity, and the policy of the maritime law, is averse to any devices which may weaken the inducement to exertions, for saving either ship or cargo by the owner, master or mariners, and

operate as an incentive to fraud ; but in the first case put, it would operate to place the value of the property lost by the obligee in the bottomry bond, in the pocket of the insured.

ALBANY,
February,1805.

Smith
v.
Williams.

We find no express authorities on this subject, in our own, or the British courts ; but if the positions laid down by *Emerigon** and *Valin*,† which have been cited, are to be received as correct, they would fully establish the point, that the value covered by the bottomry is not an insurable interest.

* 2 *Emer.* 386.
396.
† 2 *Val.* 61.

To the objections which have been urged against receiving the law from *Valin* and *Emerigon*, on their authority, it may be observed, that their positions on this subject, appear untinctured by local considerations, and if the mind assents to their correctness, there can be no reason for resisting truth, from whatever source it may be derived.

The treatise of *Valin*, is professedly a commentary on the ordinances of Louis XIV. But in illustrating the doctrines they sanction and enforce, it refers to the antecedent usages which had obtained in the several nations of Europe ; the ordinances of the free Imperial, French, Italian and Hanseatic towns ; the city of *Wisbuy* on the *Baltic ;* imperial and royal ordinances ; and, among the rest, some of their principles are said to have been deduced from the ordinances of *Eleanor*,§ wife of *Henry*, II. king of *England*, then dutchess of *Guyenne*, one of the fiefs held of the crown of *France*, and of consequence, in the spirit of those times, the dutchess was considered as one of its vassals. These ordinances were afterwards confirmed and enlarged, according to the French writers, by her son, *Richard* I. king of *England*, who was also duke of *Guyenne*, and, of course, stood in the

§ *Conference de . . r . inance,
Louis XIV.* 7.

Q

ALBANY,
February, 1805.

Smith
v.
Williams.

same relation to the crown of *France* with his mo-
ther.    But the *English* respect them as the produc-
tion of that king.    This is merely intimated by way
of illustrating the origin of the usages which influ-
ence the modern commercial regulations, and the lit-
tle regard which has been paid to the authority which
promulgated them ;  for, in this instance, on the foot
of authority, they would probably have been indig-
nantly rejected by the *French*, as the act of one of the
feudatories of the monarchy.

The laws of *Oleron*, could receive no sanction in
*France ;* and, perhaps, not in *England*, from the au-
thority of king *Richard ;* and it has even been doubted,
from the language in which they are published, and
from the places mentioned in them, whether their ob-
ject extended beyond the dutchy of *Guyenne.*    There
were unfavourable circumstances arising from the
relative situation of the prince who enacted, and the
princes whose subjects received them, to repel their
introduction, even on the ordinary ground of public
utility and convenience ; and yet it appears, from the
French writers, that they are considered as forming
part of their maritime code.

The laws of *Oleron*, have been mentioned as a com-
pilation, and probably were so.    They must have ob-
tained the authority attached to them, in consequence
of their intrinsic worth, and the estimation in which
they were held, to regulate the intercourse between
the merchants of different nations.

If such their origin, and such the steps in which
we trace the progression of these celebrated codes,
from ancient to modern times, why should the in-
quiry whence they originated, be permitted to banish
from our country, the well established, salutary usages

of trade, sanctioned by the long experience of the European nations ?

The English courts consult the French authors, on general maritime law. *Park* observes, that the ordinances of *Louis* XIV. " are an excellent body of sea-laws, to the merit of which all *Europe* has borne testimony ;"* and he remarks, that they had the good fortune to meet with a laborious commentator in *Valin*, who, he says, " being thoroughly sensible of the advantages, which his country must necessarily derive from such an excellent code, has, with a degree of labour and industry, which excite our admiration, and which are highly deserving of imitation, placed it in the most favourable point of view ; has cleared up every obscurity, by tracing their laws to their ancient sources," &c.

Of *Emerigon*,† he also speaks in terms of high approbation, and of the " *infinite labour, unwearied study and reflection*," with which he had made his collection.

All our laws relative to insurances and bottomry, are derived to us, from similar sources, and I rather think, though I speak only from general recollection, not having examined the point, that few other than restraining statutes exist in *Britain*, respecting them.

This case has been likened to the case of a judgment and mortgage ; but in both cases, though the existence of the lien must necessarily terminate by the operation of a title paramount, or with the destruction of the subject on which it attaches, the debt survives. The right of the holders of those securities, may be more circumscribed by events of that description, as to object, but retain all their energy as to the per-

ALBANY,
February, 1805.

Smith
v.
Williams.

* *Park's, Intro.* 39.

† *Ibid,* 40.

son and remaining property of the judgment debtor, or mortgagor, and the safety of the property bound by the judgment or mortgage, does not form the essence of the debt: Not so with a bottomry interest, which perishes with the ship to which it attaches.

It will be perceived, that I have not confined myself precisely to the line in which this case has been discussed, or pursued it in the extent to which it was protracted ; that I limit my opinion simply to the points, that there is no ground to question the judgment of the royal *consulado*, and that the *owner of a ship, covered by a bottomry bond, to an amount beyond her value*, has not an insurable interest.

I am therefore of opinion, that the judgment of the supreme court be reversed.

Judgment of reversal.